615 A.2d 979

COLUMBIA GAS TRANSMISSION CORPORATION,
a Delaware Corporation, Appellant,

v.

Delbert PIPER and Marcelene H. Piper, his wife, Appellees.

Commonwealth Court of Pennsylvania.

Submitted on Briefs May 13, 1992.

Decided Sept. 10, 1992.

George Hay Kain, III, for appellant.

John R. Gailey, Jr., for appellees.

Before CRAIG, President Judge, and DOYLE, PALLADINO, McGINLEY, PELLEGRINI, FRIEDMAN and KELLEY, JJ.

McGINLEY, Judge.

Columbia Gas Transmission Corporation (Columbia) appeals from an order of the Court of Common Pleas of Adams County (trial court) that denied Columbia's petition for post-trial relief from an order awarding Delbert Piper (Piper) and his wife Marcelene (together, the Pipers) $60,000 damages in accordance with a jury verdict in an eminent domain proceeding. Our scope of review in an eminent domain proceeding is limited to determining whether the findings of fact are supported by competent evidence and whether the common pleas court committed legal error. *Department of Transportation v. Schodde,* 61 Pa.Commonwealth Ct. 77, 433 A.2d 143 (1981).

Columbia had an existing gas-line easement thirty feet wide and 1,940.14 feet long across the 75.68–acre property of the

Pipers. Columbia appropriated a new easement fifty feet wide for another pipeline (completed in 1982), which overlapped the existing one by fifteen feet, resulting in a total new area taken of approximately 1.5 acres. Piper testified before the Board of View that his damages were between $400,000 and $585,000. An appraiser called by Columbia testified that the damages were between $11,250 and $12,000. The Board of View awarded $100,000 in general damages, and Columbia appealed. At trial Piper testified as his sole expert on valuation; he claimed damages of $225,000. Columbia's expert testified to a "before" value of the entire property of $189,000 and an "after" value of $174,000, for damages of $15,000. The jury awarded $60,000.

Columbia learned through discovery that Piper had three appraisals of the damages performed by valuation experts in 1982 and 1983. A report by Joseph McGraw, now deceased, set damages at $25,000; one by Charles Oreberg (Oreberg) set damages at $19,000, and the last, by T.R. Ahrens (Ahrens), set damages at $12,000 to $18,000. Columbia sought to elicit testimony from Piper on cross-examination as to the existence of those reports and their dollar amounts. Counsel for the Pipers objected on the basis of hearsay. The court permitted Columbia to question Piper concerning the existence of the reports and whether he considered them in arriving at his estimate of damages but not as to the dollar amounts. In the presentation of its own case Columbia subpoenaed and called as witnesses Oreberg, Ahrens and James J. McGraw, the son and business successor of Joseph McGraw. Columbia responded to Piper's hearsay objection to the admission of the reports by noting that two of the preparers and the business-record custodian of the third were in the room.

Columbia called Oreberg, who stated that Piper retained him and that he prepared an appraisal report. Oreberg declined to answer questions concerning the figures in his appraisal absent an order from the court to do so. He stated that he regarded the contents of his report as "privileged information," and he read from Ethical Rule 4–1 of the standards of professional practice and code of professional

conduct of the American Institute of Real Estate Appraisers. That rule states that it is unethical for an appraiser to disclose analysis, opinions, conclusions or an appraisal to anyone other than the client or those authorized by the client to receive the information, except to third parties as required by statute or by an order or court or to the duly authorized communities of the appraisal institute. Notes of Testimony of October 23–25, 1989 (N.T.) 262; Reproduced Record (R.R.) 292a. In response to a question from the court Oreberg stated that, apart from the ethical question, he did not wish to testify for Columbia on the issue of valuation. N.T. 276–77; R.R. 306a–07a. The court declined to compel Oreberg to testify. The second appraiser, Ahrens, stated that he claimed the same privileges as Oreberg and declined to answer, because of his responsibility to his original client, who had not authorized him to share the information with other persons. N.T. 291; R.R. 321a. The court declined to compel Ahrens' testimony as well.

Columbia states two issues relating to the appraisers and their reports: (1) whether the court erred in failing to order the three appraisal witnesses to testify and (2) whether the court erred in not permitting Columbia to question Piper on cross-examination about the dollar amounts in the reports. We take note that questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court, whose decision will not be disturbed absent a clear indication of abuse of that discretion. *Henry v. McCrudden,* 133 Pa.Commonwealth Ct. 231, 575 A.2d 666, *petition for allowance of appeal denied,* 526 Pa. 651, 585 A.2d 470 (1990).

The trial court ruled on these issues first on the basis of *Pennsylvania Co. for Insurances on Lives and Granting Annuities v. Philadelphia,* 262 Pa. 439, 105 A. 630 (1918). There a condemnor attempted to call as its own witness two real estate experts previously employed by the condemnee, in a similar situation where those experts had arrived at valuations closer to that advanced by the condemnor. The condemnee objected, and the witnesses themselves stated that they did not wish to testify because they had not been

released from their employment by the condemnee. The Supreme Court stated that, in view of the witnesses' own objections, it was not necessary to rule on the trial court's stated reason for not compelling the testimony—that the witnesses still maintained a "confidential relationship" with the condemnee. The Court held that, although the State may compel the appearance and testimony of experts in matters such as those affecting the public weal or criminal proceedings, "[T]he private litigant has no more right to compel a citizen to give up the product of his brain, than he has to compel the giving up of material things. In each case, it is a matter of bargain, which, as ever, it takes two to make, and to make unconstrained." *Pennsylvania Co.*, 262 Pa. at 442, 105 A. at 630.

The trial court in the present case acknowledged the authority from other jurisdictions presented by Columbia holding that a witness previously employed by a condemnee (or condemnor) might be called to testify by the other side, but it noted that such authority is not unanimous. The court concluded that reasons for not admitting the evidence were more compelling than those for admitting it, listing, in addition to the effect of the witnesses' wishes under *Pennsylvania Co.*, the obvious fact that such a procedure raises ethical concerns, that Piper had not released them from employment, that Columbia had other witnesses available to it and that a policy of fundamental fairness should protect a party who hires a witness in anticipation of litigation. The court expressly stated that it did not rely on an appraiser-client privilege.

Despite the trial court's statement, Columbia first argues that an appraiser-client privilege is not recognized in Pennsylvania, noting the various privileges expressly adopted by the legislature in 42 Pa.C.S. §§ 5913 through 5945.1. It argues that no such privilege should now be judicially created. It next attempts to distinguish *Pennsylvania Co.*, emphasizing that the Supreme Court's affirmance was *not* based on the trial court's "confidential relationship" rationale. In *Pennsylvania Co.*, Columbia asserts, the experts were called on to provide expert testimony, whereas here the appraisers were

*not* called to testify as experts or to re-perform their appraisals, but rather simply to authenticate and to read to the jury documents (the appraisal reports) that they had prepared years earlier. Therefore, Columbia argues, the "product of his brain" rationale does not apply. Columbia also infers that the witnesses in *Pennsylvania Co.* were not being compensated by the condemnor, and it notes that it offered full compensation to these witnesses for their time. Piper's response on this point consists of a general objection to the admission of the contents of the reports as hearsay.

In our view the present case is not significantly different from *Pennsylvania Co.* In preparing an appraisal report an expert appraiser assembles relevant facts and then applies expertise and judgment to them to arrive at a conclusion as to value. That conclusion constitutes an expert opinion. Whether that appraisal is contained in a report prepared (even years) before trial or is elicited during examination at trial, it is still the product of the appraiser's brain.

Additionally, we disagree with Columbia's assertion that the witnesses were called to provide only authentication, not expert, testimony. At this point Piper's hearsay objection becomes pertinent. Because the dollar amount of an appraisal report is an expert opinion, the report is not offered to prove the "fact" of value. Rather, the out-of-court statement is offered to prove the fact that the appraiser's *opinion* as to value was the amount stated at the time the report was prepared. However, out-of-court statements of opinion are treated differently from out-of-court recitations of facts. For example, business records are generally admissible, regardless of the availability of the preparer for cross-examination, under the Uniform Business Records as Evidence Act, 42 Pa.C.S. § 6108, which provides in part:

(b) **General Rule.**—A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the

sources of information, method and time of preparation were such as to justify its admission.

Hospital records are admissible under this provision to show the fact of hospitalization, treatments prescribed and symptoms given, but opinions, diagnoses and conclusions contained in such records are *not* admissible. *Commonwealth v. Seville,* 266 Pa.Superior Ct. 587, 405 A.2d 1262 (1979).

> The rationale for excluding medical opinion in hospital records lies in the fact that such evidence is expert testimony and is 'not admissible unless the doctor who prepared the report is available for in-court cross-examination regarding the accuracy, reliability and veracity of his opinion.' Commonwealth v. McNaughton, 252 Pa.Super. 302, 307, 381 A.2d 929, 931 (1977) .... Medical opinions and conclusions are often the subject of conflicting judgment among qualified physicians and hence should be subject to 'the severest of examinations to test [their] strength.' Paxos v. Jarka Corp., 314 Pa. 148, 154, 171 A. 468, 471 (1934). Such stringent cross-examination to challenge the correctness of the opinion and qualifications of the assertor is only possible if the physician is present in court.

*Seville,* 266 Pa.Superior Ct. at 591, 405 A.2d at 1264.

■ The same rationale applies to the expert opinions that are the dollar amounts of the appraisal reports in the present case: they are themselves expert testimony, and they are admissible over a hearsay objection only if the preparers are available for cross-examination. Further, the cross-examination to explain, clarify and defend the expert opinion is also expert testimony, not mere authentication. Hence Columbia's request *was* for the trial court to compel expert testimony against the experts' wishes.

■ The trial court's rationale of fundamental fairness to a party who hires a witness in anticipation of litigation also is persuasive. We note that Pa.R.C.P. No. 4003.5(a)(3) generally prohibits the discovery of materials such as these reports:

> A party may not discover facts known or opinions held by an expert who has been retained or specifically employed by

another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, except a medical expert as provided in Rule 4010(b) or except on order of court as to any other expert upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by any other means, subject to such restrictions as to scope and provisions concerning fees and expenses as the court may deem appropriate. Columbia has not asserted any reasons why it is impracticable for it to obtain facts relating to the issue of value or to obtain its own expert opinion on the question of value. In fact, Columbia did present its own expert witnesses—a civil engineer and a real estate valuation expert. Columbia suffered no prejudice whatsoever to its ability to present its own case. An order of court directing Piper's appraisers to testify to the contents of their reports definitely would violate the spirit and purpose of Rule 4003.5(a)(3).

▮ We conclude that, far from committing an abuse of discretion, the trial court was correct under *Pennsylvania Co.* in declining to compel the testimony of the two appraisers. Although Columbia preserved an objection to the exclusion of the report of the deceased appraiser based on the business records exception, it did not call Joseph McGraw to attempt to prove that he participated in the preparation of his father's report. Therefore, all three appraisers were unavailable for cross-examination—one by reason of death and two for other reasons. Under *Seville*, because the preparers were unavailable, the court correctly refused to admit the dollar amounts of the appraisals themselves into evidence.

Columbia also contends that the trial court erred in prohibiting it from questioning Piper concerning the dollar amounts of the three appraisals during cross-examination. It notes that the rule that cross-examination may not exceed the scope of direct examination does not apply where a party offers himself as a witness. *Jess v. McMurray*, 394 Pa. 526, 147 A.2d 420 (1959). In such a situation the party may be cross-examined freely as to any matter that is relevant and material

to the issues. *Id.* Further, the credibility of a witness on dispositive facts is always in issue, *Brozana v. Flanigan,* 309 Pa.Superior Ct. 145, 454 A.2d 1125 (1983), and a condemnee who testifies as to his opinion on damages in an eminent domain proceeding may be asked what he paid for the property (if the acquisition was not so remote as to deprive the price of relevance) for the purpose of attacking the credibility of the condemnee as a witness. *Earnest et ux. v. Westmoreland County Municipal Authority,* 197 Pa.Superior Ct. 638, 179 A.2d 671 (1962).

This matter was the subject of an extensive sidebar discussion. Although this question arose before the issue of the testimony of the appraisers, the trial court considered it in the context of Columbia's stated intention to call them as witnesses in the presentation of its own case. Both parties agreed that if the amounts of the appraisals were revealed to the jury in cross-examination of Piper, a strict instruction to the jury would be necessary to indicate that those figures were not offered as substantive evidence, and the jury could not consider them in making its determination of damages. The trial court at first indicated a willingness to allow the figures to be discussed but ultimately decided to permit mention of them only if the appraisers themselves testified. N.T. 237–46; R.R. 267a–76a.

Columbia argues that the trial court should have permitted mention of the figures in the appraisal reports because they were not being offered for the truth of the matter asserted but only for the always relevant purpose of impeaching the witness. As the discussion above indicates, however, the figures in the appraisers' reports are expert opinions, which are always offered for the truth of the matter asserted. Regardless of the purpose for which Columbia wished to mention the figures—whether for impeachment or to prove value or some other purpose—to have any effect the figures had to be accepted as accurate representations of the appraisers' opinions.

Of course, a condemnee is not bound to rely upon appraisals that he or she rejects as too low, any more than a condemnor

is bound by only the highest valuation it receives from an expert it retains. Here the existence of the reports was not kept from the jury. Piper testified that he received them but did not consider them in his calculation of value. The jury was free to infer that the appraisals were less than the amount the Pipers were claiming. Beyond that, however, introduction of the dollar figures themselves, which were similar to Columbia's evidence, only tended to corroborate Columbia's position. We believe that the safest and best course is the one navigated by the trial court and that the court properly decided to reject the use of the appraisals. The court sensibly, and correctly, declined to admit the hearsay figures from the appraisers' reports in the context of cross-examination, preferring to admit them, if at all, during the presentation of Columbia's case. After all, it is for the jury to determine what weight each witness's testimony is to be given; that an army of appraisers disagree with the owner is not decisive.

█ Next, Columbia argues that the trial court erred in permitting two of Piper's witnesses, Ginny Reichart (Reichart) and Loy King (King), both real estate brokers, to testify as "real estate valuation experts" without offering a "before and after" value of the property. The trial court stated that Columbia misperceived the nature of these witnesses' testimony. They were not offered as valuation experts on the value of this particular piece of property but rather to explain certain factors that Piper himself considered in performing his valuation.

Reichart's testimony consisted of stating that as a licensed real estate broker she has an ethical duty to inform a prospective purchaser of the existence of a high-pressure natural gas line on the property, and that the existence of such a gas line depresses value. N.T. 135–37; R.R. 165a–67a. On cross-examination she stated that no one had offered to purchase the sole lot through which the pipeline passes (as distinct from the portion of the property not divided into lots), and that she did not know if that lot would pass a percolation test. N.T. 141; R.R. 171a. King testified that, based on his review of records of sales of twelve usable building lots in and around

Oxford Township in 1982, the value of a typical building lot was $12,500.   N.T. 116–17;  R.R. 146a–47a.

In the present case, the Pipers' theory is that the existence of this kind of gas line depresses value; otherwise they would not have a claim.   The Pipers' Exhibit 4, which was an approved plan of the property showing the twenty-five lots along the perimeter, was shown to the jury without objection and was referred to frequently by both sides during trial.[1] Piper himself testified on direct examination that he thought, based on his experience as a builder in the area, that $12,500 was a reasonable price for one of his lots.   N.T. 172;  R.R. 202a.   However, Piper listed many other factors that went into his damages estimate.   He did not simply break his property into parcel lots and then multiply by the number of lots.   As this summary illustrates, the testimony of King and Reichart was cumulative to and corroborative of Piper's testimony.

Columbia argued to the trial court that it did not object to Piper's testifying that "he considered anything he wants to say he considered," N.T. 125; R.R. 155a, but that "if he let's [sic] his independent experts get up and testify to a little of this and a little of that and then he pours it in a pot and stirs it around, that lends the witnesses credibility to Mr. Piper's conclusions." N.T. 127; R.R. 157a.   In denying Columbia's motion in limine to strike the testimony of King and to prohibit the testimony of Reichart, the court agreed to make a cautionary statement to the jury repeating that their duty was to value the property as a whole immediately before and after the taking and *not* to calculate value or damages by multiply-

---

1.   Columbia cites cases holding that testimony of highly speculative possible uses should be excluded, e.g., *Chiorazzi v. Commonwealth*, 411 Pa. 397, 192 A.2d 400 (1963) (landowner's testimony as to his idea or concept of a future sixty-six-unit apartment development); *E.M. Kerstetter, Inc. v. Commonwealth*, 404 Pa. 168, 171 A.2d 163 (1961) (plans of subdivision into lots not approved until after condemnation).   These cases are inapposite where Piper presented an approved plan of lots. We express our disapproval of Columbia's method of citation, which is by incorporating a trial memorandum by reference into the argument section of its brief, with the citations themselves represented by isolated pages of opinions attached to the memorandum.

ing a price per lot by a number of lots. N.T. 129, 131–32; R.R. 159a, 161a–62a. The court reemphasized this point in its final charge.

No one disputes that Piper is statutorily empowered to testify as to his opinion of the damages. *See* Section 704 of the Eminent Domain Code (Code), Act of June 22, 1964, P.L. 84, *as amended,* 26 P.S. § 1–704 (permitting a condemnee, without further qualification, to testify as to just compensation). Here he did so. He also used other witnesses to explain the facts and data that he considered in estimating his damages, *see* Section 705(1) of the Code, 26 P.S. § 1–705(1) (permitting a qualified valuation expert to state any and all factors that he considered in arriving at his opinion).[2] Columbia appears to challenge the fact that Piper was permitted to present evidence corroborating his own testimony. However, we are aware of no principle that prevents a condemnee from seeking to corroborate his or her testimony. This was no different than Columbia's presenting expert testimony from a civil engineer concerning drainage and sewer matters in support of Columbia's valuation expert's testimony.

Columbia's reasoning regarding the admissibility of the testimony of King and Reichart merges with its argument on the third stated question, namely, whether the trial court erred by permitting Piper and the other witnesses to testify to "a so-called 'pie-making approach' taking isolated pieces of data from disparate sources and assembling them so as to appear to represent a comprehensive appraisal of a single subject parcel." Brief for Appellant at 4.[3]

2. Although Section 705 of the Code speaks only of permitting a "valuation expert" to testify to any and all facts or data that were considered in arriving at the opinion as to value, the trial court correctly cited our holding that a condemnee may offer the same kind of testimony. *Redevelopment Authority of the City of Erie v. Pulakos,* 17 Pa.Commonwealth Ct. 251, 330 A.2d 869 (1975).

3. Columbia also contends in separately numbered sections of the Argument portion of its brief that King was not qualified to testify as an expert because he had sold only three farms of similar size and that the properties on which King based his determination of the value of building lots were not comparable. Because these matters are not stated in or fairly encompassed by Columbia's Statement of Questions

In the context of its "isolated pieces of data" argument, Columbia cites *Scavo v. Department of Highways*, 439 Pa. 233, 266 A.2d 759 (1970), where the Supreme Court held that permitting a condemnee to testify as to money spent for costs of excavating, leveling, blasting and hauling to improve the land, as a separate and distinct item of damage, was reversible error. The Pipers argue that the trial court's decision (which also cited to *Scavo* ) noted that cost factors are always relevant in determining before and after value, so long as they are not viewed as distinct items of damages. In *Scavo* the Supreme Court stated:

> The condemnee may testify as to the facts and data he considered in making valuation, but when he testifies to the cost of improvements prior to listing these facts and data, that cost appears as an independent and distinct item of damage. In this case the fact that the improvements were made is relevant in that the condition of the surface of the land bears directly on fair market value, but it was improper for Scavo to have testified as to the improvements in any way other than as an 'element bearing on the difference between values before and after the exercise of the right of eminent domain.'

*Scavo*, 439 Pa. at 237, 266 A.2d at 761. Procedurally, the assertedly objectionable testimony here came first, and Piper then testified as to his opinion of the overall damages.

■ Although Piper and his witnesses testified to "isolated pieces of data" which were *factors* Piper considered in arriving at his estimate of damages, those "pieces of data" were not presented to the jury as *separate items of damage* to be added up to determine the overall damages. Columbia's position would appear to preclude all testimony from a condemnee except for that of before-taking and after-taking value, a result that is contrary to the liberal testimony rule of Section 705(1) of the Code.

Involved, they are waived under Pa.R.A.P. 2116(a). In addition, we observe that Columbia has violated Pa.R.A.P. 2119(a), which requires the Argument to be divided into as many parts as there are questions to be argued.

■ Our Supreme Court has stated, "To constitute reversible error, a ruling on evidence must be shown not only to have been erroneous but harmful to the party complaining." *Hart v. W.H. Stewart, Inc.*, 523 Pa. 13, 16, 564 A.2d 1250, 1252 (1989) (opinion announcing the judgment of the court, citing *Nebel v. Mauk*, 434 Pa. 315, 253 A.2d 249 (1969), and other cases). Even assuming, for the sake of argument, that the trial court erred in admitting the testimony of King and Reichart and portions of the testimony of Piper, Columbia has failed to demonstrate how it was harmed by such testimony, as required by *Hart*.[4] Accordingly, the order of the trial court is affirmed.

## ORDER

AND NOW, this 10th day of September, 1992, the order of the Court of Common Pleas of Adams County at No. 82–S–275, dated March 22, 1991, is affirmed.

DOYLE, Judge, concurring and dissenting.

While I concur with the majority's view that the testimony of appraisers formerly employed by Piper should not be permitted in Columbia's case in chief, and with its conclusion regarding the testimony of Reichart and King, I disagree as to the majority's conclusion that Columbia should not be permitted to use the appraisal reports initially obtained by Piper to impeach Piper's credibility.

I, thus, believe the jury was entitled to know that Piper had obtained and rejected the appraisals, and how much the appraisals were for, as well as the reasons for his rejection. Since Piper introduced testimony of what underlying factors he had relied upon, it would have been proper cross-examination to ask him what information he had possessed and discarded. The jury was entitled to hear that evidence.

4. Columbia also argues that the only permissible methods of valuation are those mentioned in Section 705(2) of the Code, 26 P.S. § 1–705(2), as subjects on which a qualified expert may testify: comparable market value, reproduction cost or capitalization. We disagree with that interpretation, and we note that this issue also was waived under Pa.R.A.P. 2116(a).

Further, with regard to cross-examination, I disagree with the majority that there is a hearsay problem. The damage estimates were not being admitted to establish the truth of those figures but merely to impeach Piper's credibility.[1] This situation is not analogous to the rule espoused in *Commonwealth v. Seville*, 266 Pa.Superior Ct. 587, 405 A.2d 1262 (1979), as the majority suggests, because that case, and those it in turn relies upon concern situations where the medical opinion was offered not to impeach, but to prove the truth of the medical opinion.

For this reason, I dissent on this issue.